**In re JACK–RICH, INC. dba Diamond Meat Packers, Debtor.**

**FARMERS & MERCHANTS BANK OF CARLINVILLE, Counter–Plaintiff,**

v.

**DeKALB SWINE BREEDERS, INC., Counter–Defendant.**

**Bankruptcy No. 94–70532.
Adversary No. 94–7047.**

United States Bankruptcy Court,
C.D. Illinois.

Jan. 30, 1997.

R. Stephen Scott, Springfield, IL, for debtor.

Duane D. Young, Springfield, IL, for De-Kalb Swine Breeders.

Donald R. Tracy, Springfield, IL, for Farmers & Merchants Bank.

Mariann Pogge, Trustee, Springfield, IL.

---

### OPINION

LARRY L. LESSEN, Bankruptcy Judge.

Before the Court are (i) the Motion for Summary Judgment filed by Farmers & Merchants Bank of Carlinville ("F & M"), and (ii) the Motion for Summary Judgment filed by DeKalb Swine Breeders, Inc. ("De-Kalb").

Before and during 1993, Jack–Rich, Inc. ("Jack–Rich") operated a meat-packing plant in Carlinville, Illinois, to which DeKalb regularly shipped hogs to be slaughtered. At all relevant times, F & M had a valid first priority security interest in Jack–Rich's inventory, accounts receivable, general intangibles and all proceeds thereof.

On December 28, 1993, DeKalb shipped three loads of hogs to Jack–Rich. The hogs were slaughtered the following day, but De-Kalb was not paid for the hogs at that time. On January 3, 1994, after a meeting between representatives of Jack–Rich and its creditors, Del Nejmanowski ("Nejmanowski"), Chief Operating Officer of Jack–Rich, spoke with Steve Roush ("Roush"), Vice–President and Administrator and Treasurer of DeKalb, about the possibility of DeKalb shipping additional hogs to Jack–Rich on a "custom kill" basis. Roush indicated that he would discuss the possibility with DeKalb's management, but that the company would not commit to such an arrangement until DeKalb was paid for the last three loads of hogs. Nejmanowski subsequently gave Roush a check for $35,010, representing the amount of the De-cember 28, 1993, invoices (apparently less cash discount) for the three loads of hogs. The following day, Nejmanowski called Roush and asked him not to cash the check because it was drawn on the wrong account. The check was never cashed. On January 6, 1994, Roush told Sue Ann Claudon of the Packers & Stockyards Administration that DeKalb had entered into a custom kill arrangement with Jack–Rich. During that conversation, Ms. Claudon warned Roush that by proceeding under a custom kill arrangement, DeKalb would not be protected with a Packers & Stockyards Act trust claim on the three loads. At some point thereafter, the meat derived from the three loads of hogs shipped to Jack–Rich on December 28, 1993, was segregated in Jack–Rich's freezer and marked with a "D", denoting "DeKalb".

On March 25, 1994, an involuntary Chapter 7 bankruptcy petition was filed against Jack–Rich, which, on March 31, 1994, was subsequently converted to a Chapter 11. On September 26, 1995, the case was re-converted to Chapter 7.

On May 5, 1994, Roush received a telephone call from Nejmanowski wherein Nejmanowski stated that the DeKalb meat had been sold and that a check would be forthcoming. On May 6, 1994, DeKalb received a cashier's check dated May 5, 1994, drawn on the Chesterfield State Bank for $45,130.94.

The complaint giving rise to this adversary proceeding was filed on April 5, 1994, by a number of valid trust claimants under the Packers & Stockyards Act, 7 U.S.C. § 181 *et seq.* Those valid trust claimants have all been paid in full; however, it is conceded by all parties that DeKalb does not possess a valid trust claim against the $45,130.94 received on May 6, 1994. F & M filed its counterclaim on September 15, 1994, claiming that the proceeds of the May 5, 1994, check represent meat subject to F & M's security interest. As of August, 1996, F & M was owed over $78,000 on its secured notes.

In order to determine whether the $45,130.94 proceeds of the May 5, 1994, check is subject to F & M's security interest, a number of issues must be resolved.

■ First, it must be determined whether the meat from which the cash proceeds were derived was subject to a "custom kill" agreement between Jack–Rich and DeKalb. If the livestock was slaughtered under a "custom kill", then the meat was at all times held in trust by Jack–Rich for the benefit of DeKalb, and, it is conceded by F & M, never became part of Jack–Rich's inventory. F & M argues that, by Roush's own admission, there was no custom kill agreement at the time the hogs were shipped to Jack–Rich and at the time they were slaughtered. Hence, the meat became Jack–Rich's inventory and thus subject to F & M's security agreement.

DeKalb argues that, before payment was made by Jack–Rich to DeKalb for the meat, the DeKalb meat was segregated and a custom kill agreement was reached by the parties. This position is supported, DeKalb argues, by the representation Roush made to Sue Ann Claudon on January 6, 1994, that DeKalb had reached a custom kill agreement with Jack–Rich.

DeKalb's position on this issue is untenable for two reasons. First, once the meat became inventory of Jack–Rich, which it is conceded occurred on December 28 or 29, 1993, it became subject to F & M's security interest. 810 ILCS 5/9–201 *et seq.* Once inventory, it could not be removed from inventory and placed in trust for DeKalb by agreement between Jack–Rich and DeKalb. Second, despite Roush's claim to Sue Ann Claudon, there is no evidence to support the assertion that the parties ever reached a custom kill agreement. In fact, Roush testified in his deposition that the essential terms of such a contract were never discussed, much less agreed upon. No invoice for custom kill charges was ever produced; no instructions on how to process the meat or where to ship it after it was processed were given. In addition, Roush told Nejmanowski that DeKalb would never enter into a custom kill arrangement until they were paid for the three loads of hogs delivered on December 28, 1993. For these reasons, the Court finds that the meat was not subject to a custom kill agreement, but that it became inventory of Jack–Rich, to which F & M's perfected security interest attached.

■ Second, DeKalb argues that the subject meat was not covered by the description in F & M's UCC–1 Financing Statement, which includes "... all the meat inventory at Diamond Meat Packers located at R.R. # 4 Carlinville, Illinois(.)" Because the UCC–1 description limited itself to inventory at the Carlinville plant, and because all of the subject meat was shipped out of the Carlinville plant before it was finally sold, DeKalb argues, the UCC–1 does not cover the meat at issue. F & M counters that the UCC–1 description also includes "accounts receivables (sic), general intangibles (sic) and other forms of obligations and other rights to the payment of money ..." Accordingly, once the meat was sold, regardless of where it was located when it was sold, the proceeds became subject to F & M's perfected security interest.

F & M's position on this issue is clearly the correct one. The subject matter over which this dispute has arisen is not meat located at R.R. # 4 Carlinville or at some other location, but rather an account receivable resulting from the sale of said meat. Where the meat was located before it was liquidated is irrelevant because F & M's UCC–1 covers "all of debtors accounts receivables (sic), general intangibles (sic) and other forms of obligations and other rights to the payment of money now owned or which may hereafter be created by debtor." This description clearly includes receivables generated by the sale of inventory, irrespective of where the inventory was located.

■ Third, DeKalb argues that Blue Jay (Jack–Rich's meat broker), not Jack–Rich, received money in payment for the subject meat and that it was Blue Jay who eventually paid DeKalb. Because there is no evidence of any identity of interest between Jack–Rich and Blue Jay, the proceeds were not "received by Debtor." According to F & M, the weight of authority does not require that the proceeds be physically received by Jack–Rich; Blue Jay is a debtor for purposes of determining whether the proceeds are "received by debtor".

*Centerre Bank v. New Holland Division of Sperry Corp.,* 832 F.2d 1415 (7th Cir.1987)

held that where a debtor conveys collateral to a transferee who takes said collateral subject to a security interest, and the transferee makes a further disposition of the property, the proceeds received by the transferee are property subject to the security interest given by the debtor and the secured party's interest continues in the proceeds under UCC Section 9–306(2).

Blue Jay served as a meat broker for Jack–Rich, taking Jack–Rich meat, selling it, and receiving the sale proceeds. In fact, it was Blue Jay who arranged for DeKalb to be paid for the December 28, 1993, meat. Clearly, then, under 810 ILCS 5/9–306(2) and *Centerre,* F & M's security interest in the DeKalb meat extends to the proceeds received by Blue Jay upon its sale.

█ Fourth, DeKalb argues that F & M has failed to adequately trace the identifiable proceeds and has failed to show that the monies were "neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings," as required by 810 ILCS 5/9–306(4)(b) or "not deposited in a deposit account prior to the insolvency proceeding." 810 ILCS 5/9–306(4)(c). F & M counters that the Chesterfield State Bank check represents identifiable cash proceeds of Jack–Rich's inventory so F & M's security interest continues in those proceeds.

Under 810 ILCS 5/9–306(4)(b), a secured party with a perfected security interest in proceeds has a perfected security interest in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings. It appears, based upon the timing of Blue Jay's payment to DeKalb, that Blue Jay received the sale proceeds from the DeKalb meat after, rather than before, the bankruptcy petition was filed against Jack–Rich. Accordingly, F & M's security interest is not invalidated by the terms of 810 ILCS 5/9–306(4)(b) even if it was deposited in a deposit account. As to whether the Chesterfield State Bank check constitutes "identifiable cash proceeds", the Court is mindful of the purpose behind the requirement that a secured creditor identify the proceeds in which it has a

security interest. "On principle the law ought to treat proceeds collateral and original collateral in the same fashion. If the law considered security interests in original collateral good against the trustee, then it should do likewise with respect to proceeds collateral, at least if the secured creditor can identify the proceeds as his." White & Summers, *Uniform Commercial Code* § 25–10 (3d ed., 1988).

█ Roush testified in his deposition that Nejmanowski called him on or about May 5, 1994, told him that he had sold DeKalb's meat, and that a check would be forthcoming. One day later, the subject check arrived in the exact amount equal to the three DeKalb/Jack–Rich invoices plus the invoice of a third-party seller who DeKalb owed for hogs which were delivered with the DeKalb hogs on December 28, 1993. In his affidavit, Nejmanowski states that DeKalb was paid for its meat with funds belonging to Blue Jay. Based upon this evidence, the Court finds sufficient evidence that the proceeds were not commingled with other money and that sufficient tracing has occurred to identify the May 5, 1994, check as "identifiable cash proceeds" to which F & M's security interest attached.

█ Finally, DeKalb argues that the equitable principle of unjust enrichment should prohibit the Court from finding in favor of F & M. DeKalb's had every opportunity under the Packers and Stockyards Act to avail itself of the protection of the statutory trust yet, for some reason, chose not to do so, even after being expressly warned of the consequences of its inaction by Sue Ann Claudon. DeKalb is a sophisticated player in the livestock agriculture business and, having made the choice not to avail itself of the protection of the Packers and Stockyards Act, must now live with the consequences of that decision. As for F & M being unjustly enriched by a decision in its favor, F & M lent money to Jack–Rich and received a security interest in Jack–Rich's assets. F & M will receive exactly what it bargained for and exactly what it is entitled to under Article 9 of the Commercial Code as a result this decision.

For the reasons set forth above, F & M's Motion for Summary Judgment is granted. DeKalb's Motion for Summary Judgment is denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.